UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL SANDERS,
                Plaintiff,                DISTRICT JUDGE VICTORIA A. ROBERTS
                                         MAGISTRATE JUDGE STEVEN D. PEPE

           v.                          Case No. 07-11905

KETTERING UNIVERSITY,
                  Defendant.
_____/

**REPORT AND RECOMMENDATION**

      Plaintiff, Michael Sanders, filed a complaint on May 1, 2007 alleging that Defendant, Kettering University ("Defendant" or "Defendant University") (1) improperly denied him tenure and terminated him based on his Iranian background; (2) retaliated against him because he complained about alleged national origin discrimination; and (3) breached its contract by terminating him without just cause (Dkt. #1). Defendant filed a motion for summary judgment based on the lack of evidence that national origin or a desire to retaliate influenced their decision to deny Plaintiff tenure or terminate his employment (Dkt. #25). Plaintiff responded and Defendant filed a reply(Dkt. # 29 &  #36). All pre-trial matters were referred on November 14, 2007 (Dkt. #11). For the reasons stated below, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**.

**I.**     **BACKGROUND**

      Plaintiff who was born and spent his childhood in Iran, came to the United States in 1984 where he earned a Bachelor's Degree in 1990 from West Texas A & M and a Masters and Ph.D.

in Industrial Engineering from Texas Tech University in 1997 and 2000 respectively (Dkt. #29, pp. 8-9). Plaintiff was first informed of the possibility of a faculty position at Defendant through his brother, Matthew Sanders, also of Iranian origin, was employed, and continues to be employed as a Full Professor in the IME Department at Defendant. (Dkt. #25, Ex. 1, p. 26; and Affidavit of Matthew Sanders, Ex. 2.) On August 4, 2000, Plaintiff submitted a letter to Dr. Petros Gheresus, Director of Industrial Engineering at Defendant University, inquiring about the position and attaching his resume (Dkt. #25, Ex. 3). Plaintiff's academic specialties included organization systems, supply chain, management, global supply chain, optimization, lean manufacturing and Toyota systems. (Dkt. #25., Ex. 1, p. 15.)

After reviewing Plaintiff's letter and resume, Defendant contacted Plaintiff to arrange an on-campus interview. On August 30, 2000, the Industrial Engineering Department Head, David Poock; Program Director Petros Gheresus; Dean for Academic Programs and Research James Luxon; and Professors David Clark, Ken Morrison, Srinivas Chakravarthy and Tony Lin interviewed Plaintiff for the position of Assistant Professor (Dkt. #25, Ex. 1, pp. 28-29; and Ex. 4). On the same day of the interview Plaintiff completed the standard Defendant faculty application form (Dkt. #25, Ex. 5.) Following a successful interview, Defendant offered Plaintiff a nine-month tenure track position as Assistant Professor with an annual base salary of $68,000 (Dkt. #25, Ex. 6.) In addition to hiring Plaintiff, Defendant also extended an offer of employment to Plaintiff' then fiance, Dr. Sanju Patro for Assistant Professor in the same Department (Dkt. #25., Ex. 1, p. 37). Both Plaintiff and his fiance accepted and became part of the faculty in 2001 (Dkt. #25., Ex. 1, p. 39).

To achieve tenure, an Assistant Professor must demonstrate a record of (1) scholarly

2

activities; (2) teaching; and (3) university service. (Dkt. #25, Exhibit 7.) Pursuant to the Defendant Faculty Handbook (the "Handbook"), the tenure process is multiple-leveled and allows for numerous appeals. (Dkt. #25, Exhibit 7, § 7.) The process starts with the Department Head who must either recommend or not recommend a candidate for tenure. From there, the candidate's promotion materials (which are prepared by the candidate) are made available for review by the departmental faculty. The departmental faculty then meet and complete Candidate Assessment Recommendation Forms ("CARFs"). Should the Department Promotions Committee ("DPC") fail to grant tenure, a candidate may appeal to the University Promotions Committee ("UPC") which consists of a representative from every Department at the University who then reviews the candidate's materials and makes a recommendation. If the candidate again fails, he may press forward for a decision by Defendant's Provost, and then Defendant's President and Board of Trustees. The candidate may also appeal to the ADEPT Committee which reviews any inequities and alleged unfairness in the tenure process.

As to the scholarship requirement for tenure, the Handbook specifies that the scholarship be comprised of "a mastery of knowledge from major and related fields."(Dkt. #25, Ex.7, p. 48). The quality and significance of a candidate's work must be confirmed by tangible evidence such as approval by reputable publishers outside of Defendant University (Dkt. #25, Ex. 7, p. 48). Scholarly activity for professors in the Engineering Department is supported by giving reduced teaching loads to faculty who are on the tenure-track so they can dedicate more time to research and writing (Dkt. #25, Exhibit 8, pp. 20, 26.)

At the 2004 and 2005 CARFs evaluations denying Plaintiff tenure, the following deficiencies in Plaintiff's scholarship were noted:

• Lack of refereed publications in any journal.
• Concentration of published papers in conferences with which he
is closely associated.
• The only two publications pending acceptance by referreed
journal are joint work with his Ph.D. advisor.
• No research conducted in his area of expertise.
• Publications are of a superficial nature with no specific focus on
area of expertise.

(Dkt. #25, Exs. 9 and 10).

One of his strengths, according to Plaintiff, was that he was instrumental in bringing a

grant to the University regarding the CORDYS (a Dutch software company) program, which

Plaintiff claimed amounted to a  $1 million donation to Defendant.  Plaintiff presented materials

in support of his promotion that indicated at least $200,000 of the gift was in cash. (Dkt. #25,

Exhibit 12.)  Defendant argues that the CORDYS relationship was not a grant but software

provided at an inflated price. (Dkt. #25., Exhibit 1, pp. 70-71.)  The Executive Vice President,

Henk de Ruiter wrote that $1 million donation represented "university wide use of Cordys CBP

for $2,500 per seat for 400 seats." (Dkt. #25, Exhibit 11).  Furthermore, Defendant argues that no

record exists at its University of any type of cash contribution made by CORDYS and an

independent review committee found that the "specific claim that 20% of the $1,000,000 was

cash is a deliberate misrepresentation by Professor Sanders [Plaintiff] in documents he submitted

to support his 2005 application for promotion." (Dkt. #25, Exhibit 13.)

In preparation for the 2004 CARF, Plaintiff represented in his self-evaluation that he

established a "Cordys Business Collaboration Lab" at Defendant University, but according to

Defendant no such lab existed. (Dkt. #25, Ex. 14, p. 0288).  According to an email sent by

Defendant's Provost, John Lorenz, Defendant refused to establish the lab based on concerns of

the true nature of the CORDYS Program as detailed in the above paragraph (Dkt. #25f, Ex. 15.)

4

By February 2005, CORDYS had all but stopped doing business with Defendant because of problems with Plaintiff, to wit; the "discourteous way of communication from the side of Mr. Sanders [Plaintiff] (Dkt. #25, Ex. 16.) Henk ten Voorde, Director Program Management for CORDYS stated that "there has never been made a commitment from the side of Cordys to finance research and other activities of Mr. Sanders.  We have no intent to continue the relationship with Mr. Sanders and have not discussed any kind of cooperation since February 2005." *Id*.  In July 2005, Plaintiff represented that there was still a viable relationship with CORDYS. (Dkt. #25, Ex. 17, p. 47-48.) Based on Plaintiff's representations,  much of Defendant University faculty felt misled about the nature and viability of the CORDYS program. (Dkt. #25, Ex. 18, p. 32, 35; Ex. 19, p. 23;  Ex. 20, p. 22-23,25; Ex. 17, pp. 47-48.)

In regards to the teaching requirement for tenure, colleagues in the 2004 and 2005 CARF findings noted that Plaintiff repeated absences from courses he teaches, skipped important topics in courses, failed to attend any teaching and learning methods seminars or workshops, did not submit completed student evaluations of his teaching with those accounted for ranging from good to less good and failed to establish an area of expertise or demonstrate a particular strength in one single subject (Dkt. #25, Exs. 9 and 10).

And as to the level of service to the University requirement to achieve tenure, Defendant cites to its Handbook that an Associate Professor must show an "outstanding level of service to the University and the ....profession." (Dkt. #25, Ex. 7, p. 58.)  It is Defendant's position that Plaintiff had a weak commitment to the University and his profession.  In support of this position, Defendant cites to Plaintiff's failures to appear for a scheduled interview with a national accrediting agency, ABET, and to attend an event related to Defendant's co-op program

5

(Dkt. #25, Ex. 10, 8 p. 29-31, Exs. 21, 22 and 23). Plaintiff at the 2005 CARF presented proof of membership to two professional organizations but the CARF concluded that the dates of membership were inconsistent and there was no demonstration of contribution to either organization (Dkt. #25, Ex. 10, p. 0124).

Plaintiff was denied tenure in 2004 and 2005. He did not appeal the 2004; he did, however, appeal the 2005 decision following the appeal process to completion. At each step of the way, his appeal was denied. The reasons for not granting him tenure are as follow:

**Scholarship:**

• Letters of support were outdated and do not reflect any recent progress his area.

• Plaintiff's refereed publication was co-authored with his Ph.D. advisor.

• His is poor performance relative to the Cordys Corporation led to a dissolution in February, 2005; there was no $1,000,000 software gift.

• No record of continuous publication progress from research activities to demonstrate an expertise in a field.

• The level of scholarly effort was difficult to determine because nearly all the scholarship was co-authored with the same colleague at Defendant University.

• He had only one publication, the USP Conference.

• There was no clear evidence that either money or research activities resulted from the USP and Cordys' projects.

• During the four years at Defendant University, Plaintiff made only two submissions to a journal, which according to Defendant, fell short of demonstrating a mastery of knowledge from his major and related areas.

**Teaching:**

6

• Plaintiff provided no statement of teaching philosophy to indicate his pedagogical methods.

• Student evaluations reflected that a key course taught by Plaintiff failed to meet regularly, that Plaintiff missed a lot of classes, did not listen to students, and skipped important topics in favor of his pet topics.

• His work habits are to show up in the office 30 minutes before he's due to teach, go to class late, teach, and leave 30 minutes later.

• Despite Plaintiff's claims that he is pursing research in teaching and learning methodology, he never attended any teaching and learning methods seminars or workshops.

• Some students indicated in their evaluation that the Plaintiff was rude to the students.

• Plaintiff failed to demonstrate that he was assessing the courses that he is teaching as is required by the ABET guidelines.

**Service to the University:**

• Plaintiff was absent from an ABET visit.

• Plaintiff could show no evidence of outreach on behalf of Defendant.

• Plaintiff's disregard for licensing of software and the misrepresentation to the Defendant University of outside funding and cooperative relationship with CORDYS

• The lack of existence of the CORDYS grant casted doubt on the veracity of his professional work.

• Plaintiff was absent from several IME Faculty meetings while the faculties were in the process of working on curriculum and department's future direction.

(Dkt. #25, Exs. 9 and 10).

During the appellate process, Defendant uncovered other information about Plaintiff that

7

was of concern to them, including the inaccuracy of Plaintiff's employment history, representations of primary authorship on an article written with his brother, representations of delivering a keynote address at a USP conference and his failure to return in a timely manner $25,000 to the CORDYS Corporation that had been given to him to set up a USP conference, a conference that never too place for reasons that Plaintiff failed to perform the necessary groundwork to make the conference happen. This information led to the initiation, per the Handbook, for an informal resolution process, a process in which Plaintiff refused to participate (Dkt. #25, Ex. 7). Plaintiff was suspended with pay during the investigation and a committee was formed consisting of Professor Mark Wicks (Department Head, Electrical & Computer Engineering), Professor Kathryn Svinarich (Associate Professor, Department of Science & Math), and Linda Peterson (Vice President of Human Resources), to investigate the complaint. (Dkt. #25., Ex. 1, pp. 168-169.)

On March 31, 2006, Plaintiff received a letter from Defendant University informing him that his appointment with the university would end at the end of the 2006-2007 academic school year (Dkt. #25, Ex. 32). On June 19, 2006, the above committee released a report of their findings entitled the Wicks Report. The Wicks Report concluded that Plaintiff (l) deliberately misrepresented the nature of the CORDYS grant; (2) deliberately misrepresented the value of a grant from the Pro Planner Corporation in his faculty annual assessment; (3) misrepresented himself as the primary author of an article written with his brother; (4) misrepresented his status as a keynote speaker at the USP 2001 Conference; (5) inappropriately withheld a portion of monies provided by CORDYS for a conference at Iowa State University; (6) misrepresented his most recent salary at Texas Tech University; and (7) misrepresented various employment dates

on his employment application.   The Wicks Report also noted that Plaintiff meddled with the investigation process by altering emails, declining to meet with the investigative committee, obstructing the orderly conduct of an investigation meeting and refusing to provide any substantive responses.  As a result of the Wicks Report the Defendant terminated Plaintiff effective July 28, 2006.

It is Plaintiff's belief that his problems with Defendant University began in early 2005 when Professor Morrison approached him about severing Defendant's ties with Cordys and the two men could work with Cordys privately on the project which could potentially be profitable (Dkt. #24, p. 12).  When Plaintiff stated to Professor Morrison that he would not sever his relationships with Defendant or Cordys, the relationship between the two professors disintegrated resulting in comments from Professor Morrision that Plaintiff felt were derogatory in nature.  *Id*.  Plaintiff complained to the department head of these problems, Dr. Poock, although Dr. Poock denies that such a meeting took place (Dkt. #24, p. 13).  A few weeks after the supposed meeting, the investigation into Plaintiff's work, ethics and teaching began.

## II.   ANALYSIS

### A.   Standards Of Review

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact.  The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  *See also Lenz*

9

*v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).  In resolving a summary judgment motion, the

Court must view the evidence in the light most favorable to the non-moving party.  *See Duchon*

*v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711

F.2d 1319 (6th Cir. 1983).  But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion,
> against a party who fails to make a showing sufficient to establish
> the existence of an element essential to that party's case, and on
> which that party will bear the burden of proof at trial.  In such a
> situation, there can be "no genuine issue as to any material fact,"
> since a complete failure of proof concerning an essential element
> of the non-moving party's case necessarily renders all other facts
> immaterial.  The moving party is "entitled to a judgment as a
> matter of law" because the non-moving party has failed to make a
> sufficient showing on an essential element of her case with respect
> to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not rely "upon

the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as

otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue

for trial."  Fed. R. Civ. P. 56(e).

**B.   Factual Analysis**

   **1.   Same Actor Presumption of Non-Discrimination**

Plaintiff, who was interviewed and hired by Defendant, claims that he was discriminated

against in the promotion process and subsequently terminated by the same individuals because of

his Iranian origins. "An individual who is willing to hire and promote a person of a certain class

10

is unlikely to fire them simply because they are a member of that class." *Burhmaster v Overnite Transp. Co.,* 61 F.3d 461, 464 (6th Cir. 1995); *see also Hartsel v Keys,* 87 F.3d 795 (6th Cir. 1996), *cert. den.* 519 U.S. 1055 (1997); *Town v Michigan Bell Tel. Co.,* 455 Mich. 688, 700-701 (1997). In *Burhmaster*, the court recognized that the length of time between favorable and allegedly adverse employment decisions affects the strength of the inference as to how discrimination was a factor, although time in and of itself does not rebut the presumption. *Id.*

The same individuals who filed the faculty complaint against him were part of the committee that interviewed Plaintiff' which resulted in an offer of employment (Dkt. #1, pp. 28-29). A strong presumption against discrimination arises in this case because of the relatively short time frame from when Defendant hired Plaintiff, Dr. Poock's recommendation of Plaintiff for tenure and subsequent adverse employment decisions. Plaintiff has not provided any facts that would rebut this presumption. The Defendant and the IME Department hired and promoted individuals of Iranian descent, including Plaintiff's brother who is a tenured Full Professor in the Department. From 2001 through 2005, the IME Department renewed Plaintiff's position as an Assistant Professor. Defendant promoted eight other professors of Iranian descent to tenured faculty positions. And finally, Plaintiff has not identified an individual whom he believes was treated more favorably than he.

### 2.    Direct Evidence

To establish a Title VII discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would permit an inference of discriminatory treatment. *Johnson v. University of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a

plaintiff need only prove one or the other, not both." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6ᵗʰ Cir. 1997). Under the direct evidence approach, once the plaintiff introduces evidence that the termination was because of his protected status, the burden of persuasion shifts to the employer to prove that it would have terminated the plaintiff even if they had not been motivated by discrimination. *Johnson* at 572. Direct evidence of intentional discrimination must show that employer relied on the protected status in the making of its employment decision. *Hopkins v. Electronic Data Systems Corp.,* 196 F.3d 655, 660 (6th Cir. 1998).

A stray, or isolated remark is not sufficient to constitute evidence of discrimination. *Phelps v. Yale Security, Inc.,* 986 F.2d 1020 (6th Cir. 1992), *cert. den.,* 114 S.Ct. 175 (1993). Courts reason that stray comments are "too abstract, in addition to being irrelevant and prejudicial, to support a finding of . . . discrimination. " *Phelps,* 986 F.2d at 1025. In Elliot Larsen Civil Rights actions, to determine whether a remark may be properly relied upon to infer discriminatory animus with respect to an employment decision, the following factors are considered: (1)whether the remarks were made by the decision maker or by an agent of the employer uninvolved in the challenged decision; (2) whether the remarks were isolated or part of a pattern of biased comments; (3) whether the remarks were made close in time or remote from the challenged decision; and (4) whether the remarks were ambiguous or are clearly reflective of discriminatory bias. *See Sniecinski* v. *Blue Cross Blue Shield of Mich.,* 469 Mich. 124, 136 n. 8 *(2003); Krohn v. Sedgwick James of Mich., Inc.,* 244 Mich. App. 289, 292 (2001).

Plaintiff offers seven instances of remarks that he argues indicate direct evidence of a discriminatory animus.

(1)  In the summer of 2005, Plaintiff was walking with two of his

12

colleagues in the parking lot. They were discussing various issues and the merit of foreign versus domestic auto products. At that time, Ken Morrison allegedly said that "foreigners of your type" usually side with Japanese manufacturers.

(2)  Department Head Dr. Poock spoke to Plaintiff in Persian on one occasion. During this exchange, Dr. Poock said "Hello, how are you," to which Plaintiff responded that he did not speak Persian. Dr. Poock never attempted the Persian language again.

(3)  In a faculty meeting in 2004, Ken Morrison said "fuck that shit" in a discussion about lean manufacturing and the Toyota method of manufacturing.

(4)  In the latter part of 2004, Ken Morrison said "your type always sides with foreign-type ideas."

(5)  Drs. Poock and Clark, in response to various complaints from graduate students regarding Plaintiff' inflexibility, counseled him to be more cooperative regarding providing extensions to students. They told him that he "needed to play on the team" and that they expected him to "be a team player."

(6)  Professor Chuck White told Plaintiff that his application materials must "beat Mark Palmers' materials."

(7)  In March 2005, while riding in, and discussing the merits of a Toyota Highlander, Ken Morrison accused Plaintiff of being a "Jap lover."

(Dk t. #25, Ex. 1, p. 41-42, 126, 130, 132, 134, 141.)  The only comments from Plaintiff's list that concern national origin are comments (1) and (2).  The other comments, on their face, have nothing to do with Plaintiff's Iranian origins; as such, the court will analyze the first two comments as to whether as a matter of law they constitute direct evidence of discrimination.

The comment made by Ken Morrison that "foreigners of your type" usually side with Japanese manufacturers, while maybe off putting to Plaintiff, is not as a matter of law, direct evidence of discrimination in the tenure decision making process.  Nor is Dr. Poock's attempt to

13

exchange pleasantries with Plaintiff in the Persian language proof of discrimination.  There were

ten people on the committee that denied Plaintiff tenure, only one of them was Ken Morrison.

Plaintiff is unable to point to any comment that requires the conclusion that his national origin

played any role in the decision to deny his tenure or to terminate his employment.   Five different

entities comprised of numerous individuals made the decision to deny Plaintiff tenure.

       Similarly, there is no direct evidence that retaliation was the basis for Defendant's denial

of tenure or its termination of Plaintiff. The focus of the retaliation claim focuses on  Dr. Poock

(Dkt. #25, Exhibit 1, pp. 141-42). Dr. Poock, however, was instrumental in the hiring of Plaintiff

and was one of the few IME faculty members who supported Plaintiff' candidacy for tenure in

2004 and 2005. *Id.*  Additionally, Dr. Poock played no role in the investigation regarding

Plaintiff's alleged misconduct as Defendant removed him from the process immediately

following the complaint against Dr. Poock. Dr. Poock had no input into the decision to terminate

Plaintiff. And finally, as to the Plaintiff's complaints made to Dr. Poock regarding alleged

discrimination, an event that is disputed by Defendant, that even if such a meeting took place

there is no evidence that anyone besides Dr. Poock knew about the alleged discrimination.

### 3.      Circumstantial Evidence

       In the absence of direct evidence, the Sixth Circuit applies a burden-shifting analysis

used

to employment discrimination claims brought under Title VII.  *See McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* framework, the plaintiff bears the

initial burden of establishing a *prima facie* case of discrimination by a preponderance of the

evidence.  In order to make out a *prima facie* case of national origin discrimination, a plaintiff

14

must demonstrate by a preponderance of the evidence that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. See *Town* v *Michigan Bell,* 455 Mich. at 695; *Lytle* v. *Malady,* 458 Mich. 153, 172-73 (1998).  As it would apply in this case, Plaintiff must prove by circumstantial evidence that Defendant's review boards treated him differently than similarly situated Americans who engaged in the same or similar conduct. If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate some legitimate reason for its actions "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks,* 509 US. 502 (1993).  He must also prove that any difference in treatment was based on intentional discrimination as opposed to some other bona fide business reason. *Furnco Construction Corp. v. Waters*, 438 U.S. 567 (1978); *Mitchell v. Toledo Hospital* 964 F.2d 577, 582-83 (6th Cir. 1992).

Plaintiff has failed to provide evidence that he was performing his job as an assistant professor at a level which met the Defendant's legitimate expectations.  *See Ang* v. *Procter & Gambler Co.,* 932 F.2d 540, 548 (6th Cir. 1991).  Among the numerous examples of Plaintiff's sub-par performance, Plaintiff's misrepresentations of the details of the CORDYS project ranks as one of the highest.  The CORDYS Grant was comprised entirely of software and did not involve any cash and what relationship existed between CORDYS and Defendant was terminated in February 2005 under negative circumstances caused by Plaintiff.  He also failed to provide evidence demonstrating a commitment to the Defendant University in his teaching, scholarship or service which would qualify him for tenure.

15

Plaintiff has also failed to bring forth any evidence indicating any connection between his national origin and the denial of tenure and his subsequent termination. The comments made primarily by Morrison were, even if assumed to be discriminatory, are not sufficient to establish discrimination in the denial of tenure. The vast majority of Plaintiff's colleagues shared the opinion that Plaintiff did not deserve tenure and many believed that he should be terminated for misconduct. Plaintiff failed to present evidence of a pervasive anti-Iranian bias in Defendant's faculty and administration, thus his allegations about Dr. Morrison are insufficient to demonstrate causation.

As to a *prima facie* case of retaliation under Title VII of the Civil Rights Act or Elliot Larsen Civil Rights Act, a plaintiff must show: (1) he engaged in protected activity, (2) he suffered an adverse job action, and (3) there is a causal link between the protected activity and the adverse job action. *Garg v Macomb County Comm. Health Servs.,* 472 Mich. 263 (2005). To satisfy the third element, a plaintiff must demonstrate an actual link between the protected activity and adverse employment action. *Id.* at 279. To support his retaliation claim Plaintiff relies upon the temporal proximity between his alleged complaints to Dr. Poock and the denial of his tenure and subsequent discharge. The Michigan Supreme Court has made it clear, however, that in order to show causation in a retaliation case, "[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *Id.; see also West v. General Motors Corp.,* 469 Mich. 177, 186 (2003).

In the present case, assuming that Plaintiff engaged in protected activity by complaining to Dr. Poock about the comments made primarily by Ken Morrison, Plaintiff is unable to establish the required causal link between the complaint and the subsequent alleged

16

adverse employment actions.

With respect to Plaintiff's 2004 denial of tenure, Plaintiff agrees that the denial was not based on national origin and thus, could not have been based on retaliation.  The 2005 denial was based on almost identical reasoning as the non-retaliatory decision in 2004, with the additional misrepresentation from Plaintiff that 20% of the $1,000,000 grant from CORDYS was cash (Dkt. #25, Exhibit 13).  Furthermore, the written complaint filed by the IME faculty predated Plaintiff's alleged complaint to Dr. Poock regarding the alleged national origin discrimination (Dkt. #25, Exhibit 33).  After Plaintiff's suspension, Plaintiff filed a complaint against Dr. Poock, which was in turn investigated and determined that Dr. Poock added appropriately (Dkt. #25, Ex. 42). Nonetheless, Defendant took the precautionary measure of removing Dr. Poock from the investigation and establishing the independent committee consisting of Mark Wicks, Kathryn Svinarich and Linda Peterson (Dkt. #25, Ex. 13).  The committee issued the Wicks Report which detailed Plaintiff's misconduct that lead to his termination and had nothing to do with retaliation for supposed complaints made to Dr. Poock.

Assuming arguendo that Plaintiff could establish a prima facie case of national origin discrimination or retaliation, the Defendant articulated a legitimate nondiscriminatory reason for his termination.  Plaintiff has not brought forth any evidence indicating that Defendant's reasons for its employment decisions were mere pretext for its discriminatory animus toward him because of his Iranian national origin. There is no evidence that faculty not of Iranian descent were treated more favorably or that others with the same national origin were discriminated against. Interestingly, Plaintiff's brother, also of Iranian descent, along with eight other Iranian professors hold tenure at Defendant University. (Dkt. #25, Ex. 2).  While Plaintiff may feel that

17

Defendant did not fairly evaluate his merits and disagree with the decisions of the DPC, UPC, ADEPT, Provost and President of Defendant University, there is no genuine of issue material fact as to the legitimacy of Defendant's proffered bona fide business reason for the termination. Therefore, it is recommended that Plaintiff's federal and state civil rights claims be dismissed.

### 4.  State Law Contract Claim

Plaintiff also asserted a breach of his just cause employment contract claim under Michigan law. To establish a *prima facie* case, plaintiff bears the burden of proving: (1) the existence of a just cause employment contract; (2) that he had performed under the terms of the just cause employment contract up to the date of his discharge; and (3) damages. *See generally, Rasch v. City of East Jordan,* 141 Mich. App. 336,340-41 (1985). There is no genuine issue with respect to whether just cause has been established.  In the Handbook, in the Professional Responsibilities of Faculty, Conduct, and Discipline Procedures section, identifies "unacceptable conduct" that constitutes a basis for discipline, including the conduct that served as the basis for Plaintiff's  termination: "violations of intellectual honesty, such as intentionally misrepresenting others' written work as one's own or failing to credit appropriately the professional contributions of others" and "[f]alsification of records" (Dkt. #25, Ex. 7, § 7.3, p. 88.)  The Handbook lists examples of "just cause" grounds for dismissal:

> Demonstrated incompetence or dishonesty in professional activities
> related to teaching, consulting, research, publication, demonstrated
> dishonesty in professional activities, other creative endeavors, or service
> to the Kettering University community; substantial neglect of properly
> assigned duties; or personal conduct that substantially impairs the
> individual's fulfillment of properly assigned duties and/or responsibilities.

(Dkt. #25, Ex. 7, § 6.12.2, p. 77.)  Plaintiff did not posses the requisite teaching capabilities or

18

concern for students; and did not contribute meaningfully to scholarly activities or the university community (Dkt. #2, Ex. 7, § 7.3, p. 88.)  An employer has just cause as a matter of law to terminate an employee who engages in conduct that is contrary to the conditions of employment. *See Walker v. Amoco Oil Co.,* 837 F. Supp. 232 (E.D. Mich. 1993)(Gadola J.)  Because Plaintiff was in violation of the terms of the his employment, Defendant had just cause to terminate his employment.  It is therefore recommended that summary judgment on Plaintiff's breach of contract claim be issued.

## III.   RECOMMENDATION

For the reasons indicated above, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Date: March 3, 2009                              s/Steven D. Pepe_____
Ann Arbor, Michigan                              United States Magistrate Judge

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing ***Order***  was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 3, 2009.


                                        s/ Jermaine Creary_____
                                        Case Manager to Magistrate
                                        Judge Steven D. Pepe
                                        (734) 741-2298

20